**SO ORDERED.**

**SIGNED this 23 day of March, 2011.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| IVAN C. MOORE, and | ) | Case No. 09-11051 |
| BRANDY L. MOORE, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| J. MICHAEL MORRIS, Trustee | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 09-5157 |
| | ) | |
| DICKINSON COUNTY BANK and | ) | |
| IVAN C. MOORE and BRANDY L. MOORE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

1

# MEMORANDUM OPINION AND ORDER ON
# TRUSTEE'S MOTION TO AVOID LIEN ON MOBILE HOME

This matter came before the Court on December 14, 2010, for evidentiary hearing on Trustee's Complaint to avoid, pursuant to 11 U.S.C. § 544(a), the defendant Dickinson County Bank's lien on a 2000 16x76 foot single wide manufactured home, which is part of the Debtors' homestead.[1] The Trustee, J. Michael Morris, appeared by J. Michael Morris, of Klenda, Mitchell, Austerman & Zuercher, L.L.C. The Bank appeared by Peter John Orsi, II and Edward J, Pugh, of Pugh & Pugh, Attorneys. The Debtors, who were named as parties to determine their rights, appeared by Jeff Dewey, of Dewey & Lund, LLP. There were no other appearances.

**FINDINGS OF FACT**

The Court makes the following findings of fact, based upon the stipulations in the Pretrial Order, the testimony of the witnesses, and the exhibits admitted by stipulation.

Debtors Ivan C. Moore and Brandy L. Moore (hereafter collectively "Debtors") filed a voluntary petition for relief under Chapter 7 on April 15, 2009. Their schedules include as real property a residence located near Abilene, Kansas with a value of $74,000, subject to a lien of $80,000 held by Dickinson County Bank (hereafter "Bank"). Debtors claim the residence as their exempt homestead. J. Michael Morris was appointed Chapter 7 Trustee.

---

[1] The parties stipulated in the Pretrial Order (dkt. 35) "that venue is properly laid in this District, that the United State Bankruptcy Court for the District of Kansas has jurisdiction of the parties hereto and the subject matter hereof, that this is a core proceeding, and may try the adversary proceeding to final judgment; that all proper, necessary and indispensable parties are parties hereto . . ." The Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(a)and (k).

Case 09-05157    Doc# 51    Filed 03/23/11    Page 2 of 14

The homestead property is comprised of approximately 10.4 acres in a rural area on which there is a 2000 Bonn 16x 80 foot manufactured home, VIN *8115, which is a manufactured home within the definition of the Kansas Manufactured Housing Act (hereafter the "Act"), Kan. Stat. Ann. 58-4201, *et seq*. Debtors purchased the property under a Real Estate Lease to Own Contract dated January 14, 2004 from Jesse and Dolly Vincent. As purchased, the property included the manufactured home which was already located on the real estate. The contract describes the interest purchased as a parcel of ground, without separate descriptions of the residence or other improvements. Monthly payments were due the sellers beginning July 15, 2004 and continuing until June 15, 2006, at which time a balloon payment of the amount owed to Solomon Sate Bank (which held a lien form the Vincents) was due. Since their purchase, Debtors have resided in the home.

In July, 2005, Debtors completed the purchase by borrowing $68,000 from the Bank. Debtors executed a promissory note, due on July 8, 2005, and a mortgage granting a lien of $68,000 on the property. The Vincents signed over the title to the manufactured home to Debtors, Solomon Bank released its lien, and Debtors delivered the title certificate to the Bank. The Bank knew that the residence was a manufactured home. The Bank's July 6, 2005 appraisal identifies the improvements as including a ranch style manufactured home. In addition, the Bank and Debtors signed an affidavit of Permanently Affixed Manufactured/Mobile Home and Application to Eliminate Title in which they each represented that the Bonn was indeed a manufactured home. For reasons unknown, the affidavit was never filed with the Department of Revenue. The Bank renewed the loan on November 27, 2007. Debtors made a renewal note for $84,475.44 that had a maturity date of November 1, 2010 and executed a second real estate

3

mortgage for $17,000.  The two mortgages were recorded, but the Bank took no other steps to perfect the Bank's interest in the residence.

The manufactured home has been affixed to the land as demonstrated by the following facts.  The wheels have been removed from the manufactured home, which sits on cement block piers behind skirting.  Tie down straps secure the manufactured home to the ground.  The evidence establishes that this is the method often used to affix mobile homes to the land when they are situated on property not owned by the owner of the home, such as in mobile home parks, although the witnesses also testified that some manufactured homes are set on more permanent foundations.  An enclosed mud room has been added to the rear of the manufactured home.  The mud room is attached to the manufactured home with screws or nails, has a roof line that is a continuation of the roof of the manufactured home, and is permanently attached to a cement slab.  The mud room is accessed by what would otherwise be the back door of the residence.  The exit from the mud room is to a cement patio.  The residence is permanently connected to electric service, a water line supplied with well water,[2] a propane tank at the rear of the home, and a septic system.  Debtors use an adjacent garage.  Although Debtor Ivan Moore testified that the garage is owned by a relative of the Vincents, not by Debtors, the garage is included in the appraisal prepared for the Bank in July 2005 and is appraised as part of the property for tax purposes.

The records of the Saline County appraiser's office show an appraisal value of $71,090 for the property as a whole, and the parties stipulated that the "property (as a whole) was worth at least $71,090.00 as of " April 15, 2009, the date the bankruptcy was filed.  The Trustee's

---

[2] Current water is from a well, but the piping system can be switched to a water utility service.

Case 09-05157    Doc# 51    Filed 03/23/11    Page 4 of 14

expert appraiser testified that he believed this appraisal over-valued the property, but he believed the relative values on the tax appraisal were correct. The tax appraisal card indicates that the manufactured home contributes 52.12 % of the total value to the property.[3] The Bank's appraiser testified that if the home was severed from the land, its value would range from $15,000 to $16,000.

The Bank changed hands and is under new management as of mid-2010. The president of the Bank, who testified at trial, was not associated with the Bank when the Debtors' loan was made or renewed. Since the bankruptcy case was filed, Debtors have paid $10,660 to the Bank, but no payments have been made since March 2010. The Bank placed insurance on the property that covers the manufactured home and has advanced $1,944 post-petition for that purpose. The November 2007 note was due on November 11, 2010 and will not be renewed. The Bank expects to foreclose its mortgage.

**ANALYSIS AND CONCLUSIONS OF LAW**

The Plaintiff Trustee asserts that the Bank has an unperfected lien on the manufactured home which he may avoid pursuant to §544(a) and preserve for the benefit of the estate. Further, he asserts that the manufactured home is a fixture comprising 52.12% of the total value of the property mortgaged to the Bank and that the lien may be foreclosed in accord with the rights granted in the Bank's mortgage without the necessity of removing the home from the land. Initially the Bank contended that it does not have a lien in the manufactured home, but it now agrees that it has an unperfected lien which the Trustee may avoid. However, the Bank contends

---

[3] The value of $71,090 included $20,360 for the land and $50,730 for the building, with the later including $1,040 for the concrete patio, $1,990 for the mud room, and $10,650 for the garage. This leaves $37,500 in value for the manufactured home.

5

that the Trustee's only interest is a lien in personal property (not a fixture) valued at between $15,000 and $16,000, that the Trustee after avoidance has no rights under the Bank's mortgage, and that the Trustee must remove the home from the real property to realize the value of the lien.

### A. Debtors' Manufactured Home is a Fixture

"A fixture is an article in the nature of personalty, which, has been so annexed or affixed to realty that it is regarded for legal purposes as part of the realty. . ."[4] Kansas common law follows the widely used three part test to define fixtures.[5] Under this test, whether personal property affixed to real estate is a fixture depends: "(1)whether it is actually annexed to the real estate; (2) whether it is adapted to the use of the land; and (3) whether the parties to the transaction intended the personalty to be permanently annexed."[6] This common law test is consistent with Article 9 of the UCC "which adds a fourth dimension to the test: would the average buyer of the real estate reasonably expect the goods to be sold as part of the real estate?"[7] The Kansas Court of Appeals has recognized that a mobile home may become a fixture

---

[4] 36A C.J.S. Fixtures § 1 (2011).

[5] *Peoples State Bank of Cherryvale v. Clayton,* 2 Kan. App.2d 438, 439, 580 P.2d 1375, 1377 (1978).

[6] *In re Sand & Sage Farm & Ranch, Inc.*, 266 B.R. 507, 508 (Bankr. D. Kan. 2001).

[7] *Peoples State Bank of Cherryvale v. Clayton*, 2 Kan. App.2d at 439, 580 P.2d at 1377. Although the UCC statutory definition of fixture has been amended since the *Clayton* decision, the substance of definition has not changed. Kan. Stat. Ann. § 84-9-102 (2009 Supp. ), Official UCC Comment, ¶ 18. Under the prior version of Article 9, "goods are 'fixtures' when affixing them to the real estate so associates them with the real estate that, in the absence of any agreement of understanding with his vendor as to the goods, a purchaser of the real estate with knowledge of interests of others of record, or in possession, would reasonably consider the goods to have been purchased as part of the real estate." Kan. Stat. Ann. § 84-9-313(1)(a) (Furse 1996). Revised Article 9 provides, fixtures are "goods that have become so related to particular real property that an interest in them arises under real property law." Kan. Stat. Ann. § 84-9-102(41) (2009 Supp.).

6

when affixed to real property.[8]

By applying the common-law fixture elements, the Court can easily conclude that this manufactured home is a fixture. The wheels have been removed, the chassis sits on concrete block piers, and straps secure the home to the ground. It is not set on a permanent foundation, but this fact is not determinative. Many other factors support a finding that the home is a fixture. The home is permanently attached to electricity, water, propane, and a septic system. A mud room has been constructed. It is attached to a permanent concrete slap and either nailed or screwed to the manufactured home. The mud room, which is an integral part of the home, would have to be removed before the manufactured home could be detached from the real property.

The home has been adapted to use as real property. The real property is approximately 10 acres in a rural area and is suitable for residential use. The home was placed on the property before the home and the real property were purchased as a unit by the Debtors. The home and land were purchased by Debtors for use as their home, and they have lived there since the purchase. There is common ownership of the land and the home. A septic system has been installed and connected to the home. There is a concrete patio. The real property is served by utilities which are connected to the home.

The most important element is intent. There is no evidence that Debtors regarded the home other than as a permanent residence and as a part of the real property. The Bank financed Debtors' purchase of the land and the home as a single unit. Indeed, the Bank executed a document (the elimination certificate) in which it *agreed* the home was part of the reality. It just

---

[8] *Beneficial Finance Co. of Kansas v. Schroeder,* 12 Kan. App.2d 150, 737 P.2d 52 (1987). *See* 35A Am. Jur.2d Fixtures § 52 (2010)( citing cases concerning when mobile, manufactured, or recreational homes become fixtures).

7

did not get the job done. As will be more fully examined below, the Bank intended, and did, acquire a lien in the land and the home by the real estate mortgages. The Bank paid the premiums for insurance on the home and the real property, since regulators regarded the home as part of the Bank's collateral.

The Court finds that an average buyer of the real property would assume that a purchase of the real property would include the manufactured home. As shown by the appraisal evidence, there are similar properties in the area where manufactured homes are affixed to rural land.

**B. The Mortgages Executed by Debtors Granted the Bank a Lien in the Manufactured Home.**

The Bank initially contended that the mortgages granted by Debtors did not convey a lien in the manufactured home, but this argument is met by the plain language of the mortgages. The granting clauses of the mortgages state, "For valuable consideration, Grantor mortgages and warrants to Lender the following described real property, together with all existing or subsequently erected or *affixed* buildings, improvements and fixtures." The mortgages also grant "a Uniform Commercial Code security interest in the Personal Property and Rents" and define Personal Property as meaning "all equipment, *fixtures*, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or *affixed* to the Real Property. . ." The security agreement portion of the mortgages states, "This instrument shall constitute a Security Agreement to the extent any of the Property constitutes *fixtures*. . ." There can be no question that Debtors granted the Bank a lien in the described real property, fixtures attached to the real property, and other personal property attached to the real property and that the lien attached.

8

The Bank also contended that the mortgages could not grant it a lien in the manufactured home by the real estate mortgages because the certificate of title had not been eliminated pursuant to the Act. Bankruptcy Judge Somers, in an unpublished opinion[9] has rejected this position, and this Court finds his reasoning sound. Kan. Stat. Ann. § 58-4214(a) (2009 Supp.) provides a procedure for "eliminating" the title to a manufactured home so that ownership of the home be considered an incident of ownership of the real property on which it is located for purposes of *perfecting* a security interest in it. The elimination statute neither addresses nor precludes reliance on the Kansas common law of fixtures for determining whether a mortgage lien attaches to the home.

While the Bank acts perplexed about this property having a different legal character for different purposes, Kansas law has long treated manufactured and mobile homes as different kinds of property for different purposes. They are real property for property tax purposes,[10] personalty in which liens can be perfected under the certificate of title law,[11] or may be "converted" to real property for lien purposes by the "elimination" statute.[12] Whether or not this smacks of the "through the looking-glass" world of *Alice and Wonderland* or would offend the patently un-offendable Flashman, it apparently works for the Kansas Legislature whose acts this

---

[9] *Morris v. Solomon Sate Bank (In re Elder)*, adv. no. 04-5229, case no. 04-12898 (Bankr. D. Kan. Nov. 7, 2005). *But see Wachovia Bank, N.A. v. Morris (In re Thomas)*, 362 B.R. 478 (10th Cir BAP 2007) (Kansas common law of fixtures has been rendered inapplicable to manufactured housing by the Kansas Manufactured Housing Act). The Court considers that *Thomas'* statement concerning the Act's blanket displacement of fixture law *dicta*. The Act supplies the two means of perfecting a lien in a manufactured home, but does not purport to displace other property law concepts.

[10] Kan. Stat. Ann. § 79-340 (Furse 1997).

[11] Kan. Stat. Ann. § 58-4204 (2009 Supp.) and Kan. Stat. Ann. §84-9-311 (2009 Supp.).

[12] Kan. Stat. Ann. § 58-4214 (Furse 2005).

9

Court is required to recognize and apply.[13]

### C. The Bank's Lien in the Manufactured Home was not Perfected and may be Avoided by the Trustee.

Compliance with the Act is the exclusive manner of perfecting a lien in a manufactured home in Kansas.[14] If the certificate of title has not been eliminated in accord with the procedures stated in the Act, a lien may be perfected only by notation on the certificate of title.[15] In this case the facts establish that the title has not been surrendered and the Bank's lien was not shown on the certificate of title. The Bank's lien in the home is not perfected.

The Bank does not contest the Trustee's position that pursuant to § 544, the unperfected lien may be avoided and preserved for the benefit of the estate under §551.

### D. The Avoided Lien has a Value of 52.1% of the Value of the Interest of the Bank in Debtor's Homestead.

The Court finds the testimony of the Trustee's appraiser credible. It is his opinion that as of the date of filing, Debtors' homestead property had a value of at least $71,090, the appraised value for tax purposes. This total value included $20,360 for the land and $50,730 for the building, with the later including $1,040 for the concrete patio, $1,990 for the mud room, and $10,650 for the garage. This leaves $37,500 as value for the manufactured home, which is 52.1 percent of the whole.

---

[13] The Court is also acquainted with the exploits of Sir Harry Flashman, the wiley, thirsty and lusty veteran of battlefields and boudoirs from Afghanistan to the Zulu wars who stars in the works of George MacDonald Fraser.

[14] *Morris v. Citifinancial (In re Trible)*, 290 B.R. 838 (Bankr. D. Kan. 2003).

[15] *Id.;* Kan. Stat. Ann. § 58-4204 (2009 Supp.); and Kan. Stat. Ann. § 84-9-311 (2009 Supp.).

The Tenth Circuit Bankruptcy Appellate Panel has held that the value of a preserved lien is measured by the value of the collateral, but is limited to the amount of Debtors' debt to the creditor on the petition date.[16] In this case, the parties have stipulated that the property as a whole was "worth at least $71,090.00" on the date of filing and that $84,566.41 was owed to the Bank on that date. The Trustee has therefore agreed that the lien on the whole property should be valued at a minimum of $71,090 and the Trustee's 52.1 percent share of $71,090 is $37,500 and can be no more than $44,059.10 or 52.1 percent of $84,566.41, the Bank's claim on the date of filing. If the property yields more than $71,090 at sale, the Bank's recovery on account of its claim shall be not more than $40,507 which is 47.9 percent of its claim.[17]

**E. The Trustee's Remedies for Realizing the Value of the Lien for the Benefit of the Estate.**

The Bank contends that if the Trustee avoids its lien, he must remove the manufactured home from the mortgaged property in order to realize the lien's value to the estate. The Court disagrees. As the estate has no *in personam* rights against Debtors, the Trustee has no present right to dispossess them their homestead. The estate retains a lien on the home, an interest which vested in the estate as of the date of filing. The Trustee could sell the lien, such as to the Bank, Debtors, or a third party. If the Bank is granted relief from stay and forecloses its lien, the Trustee would be a necessary party to the foreclosure action, because the estate would have an interest in the property being foreclosed. The Trustee could then enforce its rights to preserve

---

[16] *In re Rubia*, 257 B.R. 324, 328 (10th Cir. BAP 2001), *aff'd* 23 Fed. Appx. 968 (10th Cir. 2001).

[17] The monetary limits on the Trustee's and the Bank's recovery assumes that the proceeds from the sale of the homestead will not be sufficient to secure postpetition interest.

11

the value of the lien for the benefit of the estate.

In addition to traditional foreclosure remedies, the mortgages expressly grant the lienholder rights under Article Nine of the UCC. Kan. Stat. Ann. § 84-9-604 addresses enforcement rights of a secured party when the security agreement covers both real and personal property. Subsection (b) of the statute "serves to overrule cases holding that a secured party's only remedy after default is the removal of fixtures from the real property."[18] The subsection provides alternatives for the enforcement of a security interest in fixtures by providing the secured party may proceed under part 6 of Article 9 or "in accordance of the rights with respect to real property, in which case the other provisions of this part do not apply."[19] As Debtors' note has matured and foreclosure looms, the Trustee may elect to enforce the estate's interest through the laws applicable to real property foreclosures.

**F. The Trustee's Right to Payments from the Bank.**

On December 14, 2009, the Court approved an agreed order stating that if the lien in the manufactured home is avoided, the Bank will turnover to the trustee a proportionate amount of the post-petition principal and interest payments made by Debtors equal to the proportionate value of the manufactured home to the whole property.[20] Now that the lien has been avoided,

---

[18] Kan. Stat. Ann. § 84-9-604 (2009 Supp.), Official UCC Comment, ¶3. *Maplewood Bank & Trust v. Sears, Roebuck & Co.*, 265 N.J. Super. 25, 625 A.2d 537 (1993) is cited as an example of the cases overruled.

[19] Kan. Stat. Ann. § 84-9-604(b) (2009 Supp.).

[20] Dkt. 18. The order states:
   The debtors are directed to continue to pay all payments due under the contract directly to Dickinson County Bank ("the Bank"). In the event the trustee is successful in avoiding the lien in the manufactured home as set out in the complaint, the Bank will turnover to the trustee a proportionate amount of the principal and interest payments equal to the proportionate value of the manufactured home to the whole property. The proportionate payments to be turned over will be as to any payments made by the debtors

12

such funds are to be turned over to the Trustee, provided, however, that the Bank may deduct payments made for the preservation of the collateral, such as insurance premiums, before calculating the Trustee's 52.1% share. The Trustee shall apply such payments to reduce the value of the estate's lien. Further, if the Bank receives payoff of the secured debt through payments from Debtors or through refinance, the estate is entitled to receive its 52.1% of the principal reduction plus interest, up to the maximum amount of the estate's lien.

**CONCLUSION.**

The Court therefore holds: (1) The Bank was granted a lien of Debtors' manufactured home by the mortgages; (2) the Bank's lien in the manufactured home was not perfected on the date Debtors filed for bankruptcy relief; (3) the Trustee may avoid the Bank's lien in the manufactured home and preserve it for the benefit of the estate; (4) the avoided lien has a value of 52.1% of the value of Debtors' homestead , but not more than $44,059.10; (5) the Trustee, at his option, may enforce his lien rights under the provisions of Article 9 applicable to personal property or in accordance with rights with respect to real property; and (6) the Trustee is entitled to 52.1 per cent of the payments of principal and interest received by the Bank post-petition, net any funds the Bank advanced for protection of the collateral, such as insurance premiums. A Judgment on Decision will issue this day.

---

from the date of the filing of the bankruptcy case forward.

Dkt. 18. The Court notes that this order was entered consistent with then-current practice. The Trustee filed a motion seeking to have payments made directly to him to which the Bank objected. The matter was set for hearing on the January, 2010 motion calendar, but this Order was submitted to the Court and approved in December suggesting that the parties have agreed to this treatment even though it appears to be contrary to *Rubia*.

13

**IT IS SO ORDERED.**

# # #